IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

_____

**ROBERT FARRIS**,

        Plaintiff,

v.                                        No. CIV 06-0130 BB/DJS

**INTEL CORPORATION, and
DOES 1-X**,

        Defendants.

## <u>MEMORANDUM OPINION</u>

THIS MATTER comes before the Court on Defendant Intel Corporation's ("Defendant") July 28, 2006 motion to strike (Doc. No. 16), Defendant's September 12, 2006 *Daubert* motion (Doc. No. 27), Defendant's November 15, 2006 motion for summary judgment (Doc. No. 35), and Plaintiff Robert Farris' ("Plaintiff") November 20, 2006 motion for partial summary judgment (Doc. No. 37).  Having reviewed the submissions of the parties and the relevant law, the Court finds that Defendant's motion to strike should be GRANTED in part and DENIED in part, Defendant's *Daubert* motion should be GRANTED, Defendant's motion for summary judgment should be GRANTED, and Plaintiff's motion for partial summary judgment should be DENIED.

## <u>Background</u>

This case stems from Plaintiff's assertion that he developed rhinitis (inflammation of the nasal mucosa) as a result of his exposure to ammonium hydroxide fumes while working as a pipefitter for a subcontractor at Defendant's Rio Rancho, New Mexico plant.  *See* Pl.'s Compl.,

¶¶ 1, 4 (Doc. No. 1); Def.'s Mot. Strike, Ex. A.  Following his exposure, Plaintiff filed suit

against Defendant asserting claims of negligence, respondeat superior, and strict liability for

abnormally dangerous activity. *Id.* at ¶¶ 14-39.  On April 19, 2006, the Court entered an Initial

Pre-Trial Report (Doc. No. 10) in which Plaintiff identified William Christensen, M.D., M.P.H. as

a treating physician who "will testify as to [his] knowledge regarding the incident, [Plaintiff's]

injuries, diagnosis, prognosis, cost and treatment."  The Initial Pre-Trial Report also set forth,

*inter alia*, the discovery deadlines in this case.  *See* Initial Pre-Trial Report.  One such deadline

was June 5, 2006 - the date by which Plaintiff was required to "identify to all parties in writing

any expert witness to be used by Plaintiff at trial and to provide expert reports pursuant to Fed. R.

Civ. P. 26(a)(2)(b)."  This deadline passed without Plaintiff submitting expert disclosures or

reports.

On June 9, 2006, Plaintiff's counsel sent Defendant's counsel a letter reiterating Plaintiff's

intention to call some or all of his treating physicians to testify to the matters set forth in the Initial

Pre-Trial Report.  *See* Pl.'s Resp. to Def.'s Mot. Strike, Ex. A.  The letter also stated:

> As part of their testimony regarding [Plaintiff's] injuries, it is our
> intention to elicit the opinions of his treating physicians regarding
> the cause of those injuries (exposure to ammonium hydroxide
> and/or other hazardous chemicals/fumes).  Based on our research
> and understanding of [Federal Rule of Civil Procedure] 26, we do
> not believe an expert disclosure/designation regarding such treating
> physicians' testimony is required.

*Id.*  On July 25, 2006, approximately seven weeks after the June 5th deadline, Plaintiff served

Defendant with two reports from Dr. Christensen.  *See* Def.'s Mot. Strike, Ex. A.  These two

reports include a three-page letter from Dr. Christensen to Plaintiff's counsel, dated June 29,

2006, and a two-page medical progress note concerning Plaintiff, dated June 16, 2006.  *Id.*  The

reports do not include any articles, reports, or studies concerning ammonium hydroxide inhalation exposure or references thereto. *Id.* Along with these reports, Plaintiff served a "Supplemental and Rebuttal Expert Witness Disclosure," designating William Christensen as a "rebuttal" expert. *Id.*

Importantly, however, the reports proffered by Dr. Christensen, dated June 16, 2006 and June 29, 2006, could not possibly rebut Defendant's causation opinions since Defendant was not required to make its expert disclosure until July 5, 2006. *See* Initial Pre-Trial Report; Certificate of Service of Def.'s Rule 26 Expert Witness Disclosure (Doc. No. 13). Further, as explained in Plaintiff's own response (Doc. No. 21), this "rebuttal" label is inaccurate: "Plaintiff is not representing that Dr. Christensen's report is based on a review of Defendant's expert's report. At the time he wrote the report, Plaintiff does not believe that Dr. Christensen had seen the Defendant's report. Dr. Christensen's report is basically a summary of opinions he had previously stated in his treatment records of [Plaintiff]." Pl.'s Resp. to Def.'s Mot. Strike, p. 7.

## Discussion

## I.      Defendant's Motion to Strike Dr. Christensen's Expert Report and Testimony

Defendant contends that Plaintiff failed to timely comply with the expert disclosure requirements set forth in Federal Rule of Civil Procedure 26(a)(2) and therefore, pursuant to Federal Rule of Civil Procedure 37, moves to strike Dr. Christensen's expert report and testimony in this case. Rule 37 provides, in relevant part, that "[a] party that without substantial justification fails to disclose information required by Rule 26(a) . . . is not, unless such failure is harmless, permitted to use as evidence at a trial . . . any witness or information not so disclosed." Fed. R. Civ. P. 37(c)(1). "The determination of whether a Rule 26(a) violation is justified or harmless is

3

entrusted to the broad discretion of the district court." *Woodworkers Supply, Inc. v. Principal Mut. Life. Ins. Co.*, 170 F.3d 985, 993 (10th Cir. 1999) (citing *Mid- Am. Tablewares, Inc. v. Mogi Trading Co.*, 100 F.3d 1353, 1363 (7th Cir.).  Although a district court need not make explicit findings concerning the existence of substantial justification or the harmlessness of a failure to disclose, it should consider the following factors:  (1) any prejudice or surprise to the party against whom the testimony is offered; (2) the ability of the party to cure any prejudice; (3) the extent to which introducing the testimony would disrupt the trial; and (4) the violator's bad faith or willfulness. *Woodworkers Supply, Inc.*, 170 F.3d at 993; s*ee also Gutierrez v. Hackett*, 131 Fed. Appx. 621 (10th Cir. 2005) (upholding trial court's exclusion of late expert report).

     With respect to the first factor, the Court agrees that Defendant would be prejudiced by permitting inclusion of Dr. Christensen's report.  As Dr. Christensen's report was not disclosed until after Defendant's expert disclosure deadline had passed, Defendant is unable to offer a report in which its expert can analyze the statements made by Dr. Christensen.  However, the Court also notes that the prejudice and surprise to the Defendant was somewhat mitigated by the fact that Dr. Christensen was identified as a treating physician in the Initial Pre-Trial Report and the opinions at issues were all contained in Plaintiff's medical records, which were produced to Defendant on May 26, 2006.  Further, the expert disclosure and report were provided to Defendant approximately two weeks before Dr. Christensen's August 11, 2006 deposition, and Defendant thoroughly questioned Dr. Christensen about his report and causation opinion at this deposition.  Thus, the first factor is fairly evenly balanced.

     Regarding the second factor, as noted above, Defendant actually deposed Dr. Christensen regarding his report and causation opinions.  However, the only way to fully cure the prejudice to

Defendant is to reopen its right to designate experts in light of Dr. Christensen's expert report. Doing so would certainly implicate the third factor because it would disrupt the existing case management deadlines and, at this point, the trial setting itself. Therefore, while the second factor does not tip the scale heavily in one direction or the other, the third factor weighs in favor of excluding the expert report.

Finally, the fourth factor - the violator's willfulness - is also relatively evenly balanced. Plaintiff identified Dr. Christensen as a treating physician in the Initial Pre-Trial Report. And, from the June 9, 2006 letter, it appears that Plaintiff believed this initial identification satisfied its expert disclosure requirements for a treating physician. *See* Pl.'s Resp. to Def.'s Mot. Strike, Ex. A. On the other hand, Plaintiff had nearly two months to submit his expert report. Yet Dr. Christensen's report was not even prepared until June 24, 2006, approximately three weeks after the June 5, 2006 disclosure deadline had passed, and then another month passed before it was provided to Defendant on July 24, 2006.

Although it is a close call, the Court will not strike Dr. Christensen's testimony. Rather, in the interest of fairness he is deemed to be timely disclosed as an expert for Rule 26(a)(2)(A) purposes. However, Dr. Christensen's Rule 26(2)(2)(B) expert report was not timely disclosed and therefore it will be stricken. *Woodworkers Supply, Inc.*, 170 F.3d at 993.

Thus, Defendant's motion to strike is GRANTED in part and DENIED in part.

### A.     The Scope of Dr. Christensen's Expert Testimony is Limited to "Fact Opinions" Formed During the Course of Plaintiff's Treatment

The fact that Dr. Christensen's expert report has been stricken does not, however, preclude the Court from considering his "fact opinion" testimony. Rule 26(a)(2) delineates two distinct types of disclosures: (1) disclosure of the identity of any witness who may provide opinion

testimony at trial in accordance with Federal Rules of Evidence 702, 703, and 705; and (2) the far more comprehensive written and signed report which Federal Rule of Civil Procedure 26(a)(2)(B) requires for "a witness who is retained or specially employed to provide expert testimony in the case or whose duties as an employee of the party regularly involve giving expert testimony."[1] Fed. R. Civ. P. (26)(a)(2).  This distinction is important here because Rule 26(a)(2)(A) clearly controls disclosure requirements for "hybrid" fact/expert witnesses, the most obvious example being a treating physician.  The commentary to Rule 26 explains that the report required by Rule

---

[1]  Rule 26(a)(2) provides in full:

> (2) Disclosure of Expert Testimony.

> (A) In addition to the disclosures required by paragraph (1), a party will disclose to other parties the identity of any person who may be used at trial to present evidence under Rules 702, 703, or 705 of the Federal Rules of Evidence.

> (B) Except as otherwise stipulated or directed by the court, this disclosure shall, with respect to a witness who is retained or specially employed to provide expert testimony in the case or whose duties as an employee of the party regularly involve giving expert testimony, be accompanied by a written report prepared and signed by the witness. The report shall contain a complete statement of all opinions to be expressed and the basis and reasons therefor; the data or other information considered by the witness in forming the opinions; any exhibits to be used as a summary of or support for the opinions; the qualifications of the witness, including a list of all publications authored by the witness within the preceding ten years; the compensation to be paid for the study and testimony; and a listing of any other cases in which the witness has testified as an expert at trial or by deposition within the preceding four years.

Fed. R. Civ. P. 26(a)(2).

26(a)(2)(B) does not apply to treating physician.[2]  Thus, it is clear that, as Plaintiff's treating

physician, Dr. Christensen is a hybrid witness for whom no Rule 26(a)(2)(B) disclosures are

required for opinions relevant to that capacity.

As a hybrid witness, Dr. Christensen is permitted to testify to "fact opinions."  However,

the scope of such opinion testimony is circumscribed.  *Hall v. Sykes*, 164 F.R.D. 46, 48 (E.D. Va.

1995) ("If a treating physician forms an opinion of the causation of an injury to a patient and the

prognosis of the patient's condition during the treatment then such opinion may be expressed by

the treating physician without the necessity of a report under Fed. R. Civ. P. 26(a)(2)(B). . . .

However, if a physician, even though he may be a treating physician, is specially retained or

employed to render a medical opinion based upon factors that were not learned in the course of

the treatment of the patient, then such a doctor would be required to present an expert written

report.").  Thus, Dr. Christensen is permitted to give expert testimony regarding "fact opinions"

as to causation, diagnosis, prognosis, and the extent of Plaintiff's disability or injury derived from

his observations and treatment.  *Ngo v. Standard Tools & Equipment, Co., Inc.,* 197 F.R.D. 263,

266-67 (D. Md. 2000).  However, such expert testimony is limited to the "fact opinions" that Dr.

Christensen formed based on his personal knowledge and observations obtained during his course

---

[2]  In particular, it states:

> The requirement of a written report in paragraph 26(a)(2)(B),
> however, applies only to those experts who are retained or specially
> employed to provide such testimony in the case or whose duties as
> an employee of a party regularly involve the giving of such
> testimony. A treating physician, for example, can be deposed or
> called to *testify at trial without any requirement for a written
> report*.  (emphasis added).

Commentary to Fed. R. Civ. P. 26(a) (1993).

of care and treatment of Plaintiff.  Dr. Christensen is not permitted to provide expert testimony

regarding any opinion he formed based on information learned outside of, and not related to,

Plaintiff's treatment.  *Zurba v. United States*, 202 F.R.D. 590, 591 (N.D. Ill. 2001).

## II.    Toxic Tort Litigation and Causation

In a toxic tort lawsuit, a plaintiff must show both general and specific causation.  *Norris v.

Baxter Healthcare Corp.*, 397 F.3d 878, 881 (10th Cir. 2005) (citing *Raynor v. Merrell Pharms.,

Inc.*, 323 U.S. App. D.C. 23, 104 F.3d 1371, 1376 (D.C. Cir. 1997) (causation in toxic tort cases

is discussed in terms of general causation and specific causation); *Kelley v. Am. Heyer-Schulte

Corp.*, 957 F. Supp. 873, 875 (W.D. Tex. 1997); *Jones v. United States*, 933 F. Supp. 894,

900-01 (N.D. Cal. 1996), *aff'd*, 127 F.3d 1154 (9th Cir. 1997); *Hall v. Baxter Healthcare Corp.*,

947 F. Supp. 1387, 1412-13 (D. Or. 1996)).  "General causation is whether a substance is capable

of causing a particular injury or condition in the general population and specific causation is

whether a substance caused a particular individual's injury. Plaintiff must first demonstrate general

causation because without general causation, there can be no specific causation."  *Norris*, 397

F.3d at 881.

## III.    Defendant's *Daubert* Motion to Exclude Dr. Christensen's Expert Testimony

### A.    Legal Standard

Federal Rule of Evidence 702 lays the foundation for this Court's *Daubert* analysis,

providing as follows:

> If scientific, technical, or other specialized knowledge will assist the
> trier of fact to understand the evidence or to determine a fact in
> issue, a witness qualified as an expert by knowledge, skill,
> experience, training, or education, may testify thereto in the form of
> an opinion or otherwise, if (1) the testimony is based upon
> sufficient facts or data, (2) the testimony is the product of reliable

principles and methods, and (3) the witness has applied the
principles and methods reliably to the facts of the case.

Fed. R. Evid. 702.

In *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, the Supreme Court observed that
"unlike an ordinary witness, see [Federal Rule of Evidence] 701, an expert is permitted wide
latitude to offer opinions, including those that are not based on first-hand knowledge or
observation." 509 U.S. 579, 592 (1993). Because of this latitude, the "trial judge must determine
at the outset, pursuant to [Federal Rule of Evidence] 104(a), whether . . . the reasoning or
methodology underlying the testimony is scientifically valid and . . . whether that reasoning or
methodology can properly be applied to the facts in issue." *Id*. at 592-93. "*Daubert* requires the
trial court to act as a gatekeeper to insure that speculative and unreliable opinions do not reach
the jury." *McClain*, 401 F.3d at 1237. The burden rests upon the party seeking to present the
expert testimony to establish admissibility by a preponderance of the evidence. *Id*.

Under *Daubert*, expert testimony is admissible if: (1) the expert is competent and qualified
to testify regarding the subject matter of his testimony; (2) the methodology by which the expert
reached his conclusions is sufficiently reliable; and (3) the expert, through scientific, technical or
specialized expertise, provides testimony that assists the trier of fact to understand the evidence or
determine a fact in issue.[3]

---

[3] In *Kumho Tire Co., Ltd. v. Carmichael*, the Supreme Court made clear that *Daubert*
applies to all expert matters described in Federal Rule of Evidence 702, even when an expert's
opinion relies on a skill or experience-based observation. 526 U.S. 137, 149 (1999). This
certainly includes a treating physician testifying as a hybrid witness. *Turner v. Iowa Fire
Equipment Co.*, 229 F.3d 1202, 1207 (8th Cir. 2000) ("A treating physician's expert opinion on
causation is subject to the same standards of scientific reliability that govern the expert opinions of
physicians hired solely for purposes of litigation.")

Regarding the second element, in order to be reliable, expert testimony must be supported by scientific knowledge. The *Daubert* Court explained that "the adjective "scientific" implies a grounding in the methods and procedure of science. Similarly the word "knowledge" connotes more than subjective belief or unsupported speculation." *Daubert*, 509 U.S. at 590. It set forth four non-exhaustive criteria for determining whether expert testimony is based on reliable scientific knowledge: (1) whether the theory can and has been tested; (2) whether the theory has been subjected to peer review and publication; (3) whether there is a known or potential rate of error associated with the theory; and (4) whether the theory of methodology employed is generally accepted in the field. *Daubert*, 509 U.S. at 593-95; *Rider*, 295 F.3d at 1197. In toxic tort cases, a "lack of epidemiological studies supporting [a plaintiff's] claims creates a high bar for [a plaintiff] to surmount with respect to the reliability requirement." *Siharath*, 131 F. Supp. 2d at 1358.

### A.    Dr. Christensen's Qualifications

Dr. Christensen earned his medical degree from Harvard Medical School and received a Masters Degree in public health from the Medical College of Wisconsin. *See* Pl.'s Resp. to Def.'s Mot. Exclude, Ex. 8. He is currently the Medical Director at the Presbyterian Occupational Medicine Clinic in Albuquerque, New Mexico, and is board certified in internal medicine, pulmonary disease, and occupational medicine. *Id.* It appears that Dr. Christensen has practiced clinical medicine in one form or another for most of his approximately forty-year career. *Id.*

It is generally recognized that in the toxic tort context, "with respect to general causation, the relevant scientific field is epidemiology and not clinical medicine." *Siharath*, 131 F. Supp. 2d at 1351. Aside from Plaintiff, Dr. Christensen has treated only two or three other patients for

ammonium hydroxide inhalation exposure - the most recent of whom he treated approximately nine years ago. *See* Christensen Tr., p. 53:3-9.  Finally, Dr. Christensen did not review any medical literature in forming his opinion about Plaintiff's condition.  *See* Christensen Tr., pp. 52:16-25 - 53:1-2.  Although this clinical experience does not suggest a background in the epidemiology or toxicology of ammonium hydroxide inhalation exposure sufficient to qualify Dr. Christensen as an expert, he was the Medical Director at the Inhalation Toxicology Research Institute in Albuquerque, New Mexico from 1988 to 1997.  *See* Pl.'s Resp. to Def.'s Mot. Exclude, Ex. 8.  Therefore, keeping in mind the liberal approach taken in qualifying a witness as an expert under *Daubert*, the Court finds that Dr. Christensen does qualify as an expert regarding general causation in this matter.

**B.      Reliability:  Dr. Christensen's General Causation Opinion**

Dr. Christensen proffered two key general causation opinions.  One, it is Dr. Christensen's opinion that ammonium hydroxide inhalation exposure causes rhinitis, sinusitis, and vertigo.  *See* Christensen Tr., p. 50:1-5.  Two, assuming that ammonium hydroxide inhalation exposure causes rhinitis, it is Dr. Christensen's opinion that mild ammonium hydroxide inhalation exposure causes

a chronic form of rhinitis that does not resolve for more than three-and-a-half years.[4]  *See* Christensen Tr., p. 100:11-18; p. 104:9-15.

In assessing the reliability of Dr. Christensen's general causation opinions it is important to note that "epidemiology is the best evidence of general causation in a toxic tort case." *Norris*, 397 at 882; *Mancuso v. Consol. Edison Co. of New York*, 967 F. Supp. 1437, 1445 (S.D.N.Y. 1997) (holding that a physician testifying as to the toxicological effect of a substance on a person must establish, *inter alia*, "'general causation' by demonstrating that, according to scientific literature, levels of the toxin comparable to those received by the plaintiff can cause the specific types of injuries he alleges"); *see also Hernandez v. City of Albuquerque*, 2003 U.S. Dist. LEXIS 26585, *8 (D.N.M. 2003) ("[T]he trial court's gatekeeping function requires more than simply taking the expert's word for it").  However, "the plaintiff need not prove that the expert is undisputably correct or that the expert's theory is 'generally accepted' in the scientific community . . . Instead, the plaintiff must show that the method employed by the expert in reaching the conclusion is scientifically sound and that the opinion is based on facts which sufficiently satisfy

---

[4]  Based on Plaintiff's symptoms during his initial examination, Dr Christensen agreed with Defendant's counsel that Plaintiff had experienced a mild exposure level:

> Q. And mild cases present with inflamed mucous membranes in a normal chest examination.  That's exactly what he had when he was first seen by Dr. Vitek on January 24th [2003]; right?
> A. Yes.
> Q. When we're talking about his level of exposure, we're talking about a mild case; right?
> A. Yes.

Christensen Tr., pp. 95:20-25 - 96:1-2.

Rule 702's reliability requirements." *Mitchell v. Gencorp., Inc.*, 165 F.3d 778, 781 (10th Cir. 1999).

As set forth in greater detail below, Dr. Christensen did not identify a single article, study, or report anywhere in his deposition testimony to support his theory of injury in this case.[5] Further, he has not described any scientific study or methodology that he conducted in forming his opinion regarding Plaintiff's injury.  Thus, in considering Dr. Christensen's general causation opinion, it important to keep the following in mind:  "Nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert." *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 139 (1997).

Dr. Christensen's first general causation opinion in this case - that ammonium hydroxide inhalation exposure causes rhinitis, sinusitis, and vertigo - was not based on any identifiable methodology that has been tested, subjected to peer review, and/or generally accepted in the medical community.  Dr. Christensen's answers to the following questions regarding the foundation for his first general causation opinion reveal the lack of such a foundation:

> Q.    I take it from your opinions that you've offered that
>        ammonium hydroxide . . . inhalation exposure[] is capable
>        of causing rhinitis, sinusitis, and vertigo; is that right?
> A.    Yes.
> Q.    So in determining whether ammonium hydroxide is capable
>        of causing those ailments, did you review any information
>        from other scientists?
> A.    No.

---

[5] The Court's assessment of the reliability of Dr. Christensen's general causation opinions would not change even if it considered the excluded Rule 26(a)(2)(B) expert report submitted by Plaintiff since the three-page report did not append or refer to any articles, reports, or studies and did not even offer an opinion regarding general causation. *See* Def.'s Mot. Strike, Ex. A.

Q.     Would you identify for me any peer review literature that
       shows that ammonium hydroxide is capable of causing
       vertigo?
A.     No.
Q.     Do you have evidence that indicates that persons exposed
       to ammonium hydroxide have more rhinitis than
       individuals not exposed to ammonium hydroxide.
A.     No.
Q.     Same question with regard to sinusitis.
A.     No.
Q.     Same question with regard to vertigo.
A.     No.
Q.     As I understand it, you don't have any epidemiological
       studies regarding ammonium hydroxide that compare
       exposed and nonexposed [sic] groups; do you?
A.     I was unable to find any, and I don't have any, no.
Q.     Do you have any idea what percentage of people exposed to
       ammonium hydroxide fumes develop rhinitis, sinusitis, or
       vertigo?
A.     No.

Christensen Tr., p. 50:1-9; p. 51:16-16, 18; pp. 53:12 - 54:1-2.

       Ironically, however, Defendant has presented the Court with a medical text that saves a

portion of the very testimony it works so hard to exclude.  In particular, Defendant attached a

toxicological text entitled "Clinical Environmental Health and Toxic Exposures" to its *Daubert*

motion.  *See* Def.'s *Daubert* Mot., Ex. D.  This text states that mild cases of ammonium

hydroxide inhalation exposure "present with inflamed mucous membranes and normal chest

examination."  John B. Sullivan, Jr. M.D., CLINICAL ENVIRONMENTAL HEALTH AND

TOXIC EXPOSURES (2nd ed. 2001).  This directly supports Dr. Christensen's opinion that

ammonium hydroxide exposure can cause rhinitis - inflammation of the nasal mucosa.  It is also

contains the precise  type of generally accepted and peer reviewed research necessary to support a

general causation opinion in a toxic tort case.  Thus, while Dr. Christensen's general causation

opinions regarding sinusitis and vertigo are not grounded in any methodology identified in the

record as tested, subjected to peer review, and generally accepted in the medical community,
much less any epidemiological or toxicological article, report, or study, his opinion concerning
rhinitis does have recognized support in the medical community.  Therefore, the Court concludes
that Dr. Christensen's opinions about sinusitis and vertigo do not satisfy *Daubert*'s requirements
but his opinion about rhinitis does.

However, Dr. Christensen's second general causation opinion regarding rhinitis does not
satisfy *Daubert*.  Again, it is Dr. Christensen's second general causation opinion that a mild
ammonium hydroxide inhalation exposure can result in a chronic form of rhinitis that comes and
goes and does not resolve in three-and-a-half years.  No scientific research is offered in support of
this opinion:

> Q.   Inside of his [Plaintiff's] nose is either red and inflamed or
>       it is not; right?
> A.   Right.
> Q.   And on February 5, 2003, it wasn't; correct?
> A.   Yes.
> Q.   On February 19th, 2003, your next visit with him, it
>       wasn't?
> A.   Yes.
> Q.   Can you explain, I guess - maybe I'm just not following it -
>       how on March 12, 2003, he would have new onset irritation
>       in the nasal mucous membranes from an exposure in
>       January[] 2003?
> A.   I think it's not unusual that they - that the evidence of
>       inflammation can wax and wane.
> Q.   From a chemical burn?
> A.   Well from a chemical exposure, yes.
> Q.   Do you have any peer review medical literature to support
>       that?
> A.   No.

Christensen Tr., p. 100:3-21.  To the contrary, Defendant's toxicological text states that, for a
mild case of ammonium hydroxide inhalation exposure, "[s]igns of improvement are generally

apparent within 48-72 hours of admission and most patients recover without significant residual

impairment." John B. Sullivan, Jr. M.D., CLINICAL ENVIRONMENTAL HEALTH AND

TOXIC EXPOSURES (2nd ed. 2001). Thus, the record contains no foundation of

epidemiological or toxicological methodology that has been tested, subjected to peer review, and

generally accepted in the medical community supporting Dr. Christensen's second general

causation opinion. Further, it appears to directly conflict with the only scientific text in this

record. Therefore, the Court finds that it is not reliable and does not meet *Daubert*'s standards.

*Wynacht v. Beckman Instruments, Inc.*, 113 F. Supp. 2d 1205, 1209 (E.D. Tenn. 2000) (treating

physician not permitted to testify that plaintiff's medical conditions were caused by chemical

exposure where he failed to identify any biochemical, medical, or toxicological principles or

studies to support his conclusions); *Cf. St. Vincent's Hosp. and Medical Center*, 380 F. Supp. 2d

334, 354 (S.D.N.Y. 2005) (doctor's observation that he had never seen a similar result in his

personal experience insufficient to support causation).

### C.      Reliability:  Dr. Christensen's Specific Causation Opinion

Having concluded that Dr. Christensen's opinion concerning general causation does not

satisfy *Daubert*, the Court need not discuss specific causation. However, the Court notes that Dr.

Christensen's specific causation opinion has severe problems. First, Dr. Christensen has not

adequately accounted for alternative explanations for Plaintiff's chronic rhinitis. Indeed, "courts

have insisted time and time again that an expert may not give opinion testimony to a jury

regarding specific causation if the expert has not engaged in the process of differential diagnosis -

that is the process of eliminating other possible diagnoses." *Rutigliano v. Valley Bus. Forms*, 929

F. Supp. 779, 786 (D.N.J. 1996); *Miller v. Pfizer*, 356 F.3d 1326, 1333 (10th Cir. 2004);

*McCorvey v. Baxter Healthcare Corp.*, 298 F.3d 1253, 1256-57 (11th Cir. 2000); *see also*

Christensen Tr. p. 333:1-4. Dr. Christensen's failure to conduct a differential diagnosis - that is to

rule out other potential causes of Plaintiff's injury - is especially problematic because the record

reflects a number of other potential causes of this particular Plaintiff's rhinitis.

First, Plaintiff has suffered from chronic rhinitis since his exposure to welding dust in

1999, yet Dr. Christensen did not rule that out as the "cause" of his current condition (i.e., did not

consider that Plaintiff's present condition is simply a continuation of the condition he has treated

since 1999). *See* Christensen Tr., p. 85:11-19.   In this regard, the Court finds the following

testimony particularly troubling:

> Q.     Is it fair to say that your opinions as to the medical cause of
> [Plaintiff's] nasal irritation were made in the absence of
> information as to whether the chronic rhinitis you've
> diagnosed him with in 1999 had ever resolved prior to his
> alleged exposure in January[] 2003?
> A.     Yes.

Christensen Tr., p. 72:10-16. Second, Plaintiff has a severely deviated septum, which can

apparently mimic rhinitis. *See* Onyia Tr., p. 20:5-24.  However, Dr. Christensen never ruled that

out as a cause of Plaintiff' condition. *See* Christensen Tr., p. 84:2-5.  Additionally, although

Plaintiff takes two medications known to cause rhinitis (an ace inhibitor and aprazolam), Dr.

Christensen also failed to rule those out as potential causes of his rhinitis. *See* Christensen Tr., p.

86:10 - P. 87:15.  Dr. Christensen's opinion regarding specific causation thus cannot satisfy

*Daubert*'s requirements on this record.

Dr. Christensen's specific causation opinion is further undermined by his failure to testify

about Plaintiff's specific level of exposure to the ammonium hydroxide.  In a toxic tort suit, like

this one, the Tenth Circuit requires that a plaintiff demonstrate "the levels of exposure that are

hazardous to human beings generally as well as the plaintiff's actual level of exposure to the defendant's toxic substance before he or she may recover." *Mitchell*, 165 F.3d at 781 (quoting *Wright v. Williamette Indus., Inc.*, 91 F.3d 1105, 1106 (8th Cir. 1996).  Dr. Christensen's testimony is utterly deficient on both of these fronts.  First, when he was asked whether there is a permissible limit for ammonium hydroxide exposure for human beings generally, Dr. Christensen answered, "I don't know.  I haven't referred to that."  *See* Christensen Tr., p. 36:17-19.  Second, Dr. Christensen testified that he had not made any attempts to quantify Plaintiff's alleged exposure to ammonium hydroxide.  *See* Christensen Tr., p.37:5 - 39:16.  Thus, as in *Mitchell*, the information relied on by Dr. Christensen with respect to Plaintiff's level of exposure was "so sadly lacking as to be mere guesswork."  *Mitchell*, 165 F.3d at 781 (quoting *Allen v. Pennsylvania Eng'g. Corp.*, 102 F.3d 194, 194 (5th Cir. 1996).  Given that Dr. Christensen testified that he does not know what the threshold limit levels are for ammonium hydroxide and the fact that he did not make any attempt to quantify Plaintiff's exposure to ammonium hydroxide, his opinion regarding specific causation does not satisfy *Daubert*.

Based on the above**,** Defendant's motion to exclude the medical causation opinions of Dr. Christensen must be GRANTED.

## IV.     Defendant's Motion for Summary Judgment

### A.      Summary Judgment Standard

Summary judgment is not "a disfavored procedural shortcut but rather [it is] an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy, and inexpensive determination of every action.'"  *Celotex Corp. v Catrett*, 477 U.S. 317, 327 (1986) (quoting Fed. R. Civ. P. 1).  It is appropriate "if the pleadings, depositions, answers to

interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P.  56(c).  In evaluating a motion for summary judgment, the court views the evidence and draws all reasonable inferences therefrom in the light most favorable to the nonmoving  party. *See Martin v. Kansas*, 190 F. 3d 1120, 1129 (10th Cir. 1999).  However, it is "not required to evaluate every conceivable inference which can be drawn from evidentiary matter, but only reasonable ones." *Lucas v. Dover Corp.*, 857 F.2d 1397, 1401 (10th Cir. 1988).

The movant's burden is "discharged by showing . . . that there is an absence of evidence to support the nonmoving party's case." *Celotex*, 477 U.S. at 325.  Only after the movant meets its initial burden does any obligation on the part of the nonmovant arise. *Id*. at 323.  Nevertheless, once the movant has met this initial burden, the opposing party must present evidence establishing a material issue of fact. *Id*. at 325.  The nonmoving party must go "beyond the pleadings" and present evidence designating "specific facts showing that there is a genuine issue for trial." *Id*. at 324.

An issue of fact is "material" if it is essential to the proper disposition of the claim. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  In essence, the inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id*.  Further, "[A] jury question does not exist because of the presence of a mere scintilla of evidence; rather, there must be a conflict in substantial evidence to create a jury question." *Walker v. NationsBank of Florida*, 53 F.3d 1548, 1555 (11th Cir. 1995).

###### B.     Analysis

General causation and specific causation are essential elements of Plaintiff's *prima facie* case for each claim asserted in this litigation.  *Norris*, 397 F.3d at 881.  Expert testimony is necessary to make this showing since this is a toxic tort lawsuit.  *Mitchell*, 165 F.3d at 784 ("We further conclude that without the benefit of their experts, Plaintiffs cannot prove causation. Accordingly the district court correctly granted Defendant's motion for summary judgment."); *Miller*, 356 F.3d at 1327 (following *Daubert* ruling, Plaintiffs were left "with no expert to provide evidence of causation.  Accordingly, the court granted summary judgement to [the defendant].") Without Dr. Christensen's opinions, Plaintiff has not presented expert testimony establishing causation.

Therefore, Defendant's motion for summary judgment is GRANTED.

## IV.     Plaintiff's Motion for Summary Judgment

Plaintiff moved for partial summary judgement on the grounds that the there is no "genuine issue" as to any material fact regarding liability and that he is entitled to judgment on the issue of liability as a matter of law.  However, as set forth above, Plaintiff has not established medical causation.  Plaintiff's failure to establish a *prima facie* element of each of its claims precludes the Court from considering this motion.  Therefore, Plaintiff's motion for partial summary judgment is DENIED.

## <u>Conclusion</u>

Based on the foregoing, Defendant's motion to strike should be GRANTED in part and DENIED in part; Defendant's *Daubert* motion should be GRANTED; Defendant's motion for

summary judgment should be GRANTED; and Plaintiff's motion for partial summary judgment should be DENIED.


DATED March 14, 2007.

_____
BRUCE D. BLACK
UNITED STATES DISTRICT JUDGE


**Attorneys:**

**For Plaintiff**
Brian P. Brack

**For Defendants**
Jennifer A. Noya